**In re NOTCHCLIFF ASSOCIATES, Debtor.**

**The COMMERCIAL BANK, Plaintiff,**

v.

**Chester L. PRICE and Richard D. Poteet, Defendants.**

Bankruptcy No. 88–5–1913–JS.
Adv. No. A90–0328–JS.

United States Bankruptcy Court, D. Maryland.

April 14, 1992.

Mark J. Friedman, Piper & Marbury, Kerry L. Weil, Frank, Bernstein, Conaway & Goldman, Jeffrey S. Getty, Goodell, DeVries, Leach & Gray, Baltimore, Md., for plaintiff/counter defendant, The Commercial Bank.

F. Thomas Rafferty, Blum, Yumkas, Mailman, Gutman & Denick, Baltimore, Md., for defendants, Chester L. Price and Richard D. Poteet.

Richard L. Wasserman, Rochelle B. Fowler, Venable, Baetjer & Howard, Baltimore, Md., trustee.

## MEMORANDUM OPINION DISMISSING COMPLAINT FOR WANT OF SUBJECT MATTER JURISDICTION

JAMES F. SCHNEIDER, Bankruptcy Judge.

The issues presented by the filing of this complaint in the bankruptcy court are (1) whether the plaintiff has been properly designated as a representative of the bankruptcy estate to bring suit in this forum

and concomitantly (2) whether the cause of action stated in the complaint has a sufficient nexus to the bankruptcy estate to give the bankruptcy court subject matter jurisdiction over the complaint. For the reasons stated, the complaint will be dismissed on both grounds.

FINDINGS OF FACT

1. On June 30, 1988, Notchcliff Associates, a Maryland general partnership, and Freestate Management Services, Inc., its corporate affiliate, filed voluntary Chapter 11 petitions in this Court. The debtors were in the business of operating a combination retirement home/health care facility located in Baltimore County, Maryland.

2. Richard L. Wasserman was appointed Chapter 11 trustee of Freestate Management Services, Inc. on November 23, 1988 and of Notchcliff Associates on November 13, 1989.

3. The Commercial Bank is the holder of two promissory notes dated April 9, 1985 and May 29, 1987 [Exhibits A and B to the complaint], executed by Notchcliff Associates in the respective principal amounts of $18,000,000 and $2,956,000 and secured by first and second deeds of trust on the debtor's real property.

4. The defendants, Chester L. Price and Richard D. Poteet, were the debtor partnership's managing general partners who executed the foregoing documents on behalf of Notchcliff. Messrs. Price and Poteet and nine other general partners in Notchcliff also joined in the execution of agreements in favor of The Commercial Bank dated April 9, 1985 and May 29, 1987 [Exhibits E and F to the complaint] by which they personally guaranteed the indebtedness of the partnership to the Bank.

5. The personal guaranty agreements contain provisions asserting that the guarantors' liability is to be joint and several, ¶ 3.3; that the guaranty agreements will not be impaired by any modification, discharge, or termination of the partnership's obligations, or by the bankruptcy or insolvency of the partnership, either voluntary or involuntary, ¶¶ 3.4 and 3.5; that the Bank or its successor enjoys the right to proceed directly against the guarantors without first extinguishing its remedies against the partnership, ¶ 3.7; and that the guarantors consent "that any action or proceeding arising out of or brought to enforce the provisions of this Agreement or any of the other Documents may be brought in any appropriate court in the State of Maryland and/or in any other court having jurisdiction over the subject matter, all at the sole discretion of the Bank, and by the execution of this Agreement the Personal Guarantors irrevocably consent to the jurisdiction of each such Court," ¶ 4.1(a).

6. On September 4, 1990, The Commercial Bank, as the holder of claims against Notchcliff Associates totalling $22,954,-217.31, filed the instant complaint in this Court against the defendants upon their personal guarantees for the full amount of the partnership's indebtedness to the Bank.

7. On November 27, 1990, this Court entered orders confirming the trustee's amended Chapter 11 plans in both the Notchcliff and Freestate cases.

8. The history of Notchcliff and Freestate and their Chapter 11 cases is told in the following excerpt from their joint disclosure statement [P. 160]:

Notchcliff Associates, a Maryland general partnership, was formed on or about April 5, 1984. The partners in Notchcliff are Willard Amoss, M.D.; W. Perry Arnold, M.D.; Vernon R. Croft, M.D.; Jose Gracia, M.D.; Jose Martinez, M.D.; Ralph J. Mirarchi; D.L. Pirovolidis, M.D.; Richard D. Poteet; Chester L. Price; Chawalit Suddhimondala, M.D. and Robert H. Wright, M.D. ...

Freestate Management Services, Inc. is a Maryland corporation which was formed on or about February 7, 1984. The sole stockholder of Freestate is Life Care Centers of America, Inc., a Maryland corporation, which as of the time of the commencement of the Freestate case was owned by the Notchcliff partners.

On or about April 27, 1984, Notchcliff Associates purchased the Notchcliff Real Property, which consists of approximately 483 acres, for development as a lifecare

community. The acquisition by Notchcliff Associates of the Notchcliff Real Property was financed, in part, by The Commercial Bank (then known as Commercial and Savings Bank, Bel Air). In or about April of 1985, a new construction/permanent loan was made by The Commercial Bank (still known at that time as Commercial and Savings Bank) to Notchcliff Associates, secured by a first mortgage on the Notchcliff Real Property. The April 1985 loan was the first of several consolidated loans made by The Commercial Bank, on behalf of itself and as lead bank for a group of participant banks, to Notchcliff Associates for the purpose of refinancing the then-existing debt and for the development and construction of the Notchcliff Lifecare Community.

As of the time of the commencement of the Notchcliff [bankruptcy] case, the outstanding principal balance of the loans made by The Commercial Bank to Notchcliff Associates was $20,930,322 according to the Schedules filed by Notchcliff. The total indebtedness of Notchcliff Associates to The Commercial Bank under its mortgage loans with respect to the Notchcliff Real Property exceeded $22,000,000 as of the date of the commencement of the Notchcliff case. Pursuant to a Corporate Guaranty Agreement dated as of May 29, 1987, Freestate and Life Care Centers of America, Inc. purported to guarantee the obligations of Notchcliff to The Commercial Bank....

In addition to the first mortgage held by The Commercial Bank, there is a second mortgage on the Notchcliff Real Property held by the School Sisters of Notre Dame which, according to Notchcliff's Schedules, secured an outstanding principal balance as of the date of the commencement of the Notchcliff case of $1,070,498, plus accrued interest thereon. In addition to the mortgage liens on the Notchcliff Real Property, there are also unpaid real property taxes for the 1988–89 and 1989–90 tax years, which total in excess of $400,000. Real property taxes for the tax year 1990–91 are also unpaid ...

In September, 1989, The Commercial Bank filed a Motion for Relief from Stay in the Notchcliff Case, seeking leave of the Court to be permitted to foreclose on the Notchcliff Real Property or otherwise enforce its rights under its mortgage loan documents. On November 19, 1989, the Court entered an Order Modifying Stay permitting The Commercial Bank, subject to certain conditions including prior notice to residents, to enforce its rights against the Notchcliff Real Property under its mortgage loan documents. The Commercial Bank has, as of the date hereof, refrained from commencing any foreclosure proceedings against the Notchcliff Real Property.

In the Notchcliff case, both The Commercial Bank and the Trustee have filed motions seeking to require the general partners in Notchcliff to file statements of personal assets and liabilities and other information. The Court has entered various Orders requiring the partners in Notchcliff to file the requested information with the Trustee.

On April 23, 1990, the Trustee filed a Motion for Order Implementing Order Modifying Stay and Authorizing Borrowing on Secured and Superpriority Basis, pursuant to which the Trustee sought to borrow up to $100,000 from The Commercial Bank, on a secured and superpriority basis, which monies were needed to fund shortfalls in the operating budget of the Notchcliff Lifecare Community through June 30, 1990. Orders were entered by the Court approving this borrowing by the Trustee from The Commercial Bank on a secured and superpriority basis, the Trustee being granted coequal priority therewith for any Court-approved compensation to the Trustee and his counsel. On August 21, 1990, the Trustee filed a Motion for Order Extending Order Modifying Stay and Authorizing Borrowing on Secured and Superpriority Basis, pursuant to which the Trustee sought to borrow the balance of the original $100,000 authorized by the Court plus an additional $28,000 from The Commercial Bank to fund shortfalls in the operating budget of the Notchcliff Lifecare Community through August 31, 1990. An appropriate Order was entered by the Court approving the

borrowing on the same terms as the previous borrowing.

As of the date of this Disclosure Statement [September 1, 1990], the Trustee has borrowed a total of $128,000 from The Commercial Bank pursuant to the Orders entered by the Court, and it is anticipated that the Trustee may require additional borrowings to fund continuing operating shortfalls pending confirmation of the Freestate Plan and the Notchcliff Plan and closing of the sale of the Operating Assets as proposed therein, assuming that the Plans are confirmed by the Court.

As set forth in more detail in this Disclosure Statement, the Plans contemplate that the Reorganized Notchcliff Community (to be known as "Glen Meadows") will be owned by C.B. Properties[1] and will be sponsored by Presbyterian Senior Services, Inc. ("PSS"), a Maryland nonprofit corporation jointly formed by the Presbytery of Baltimore and Presbyterian Homes, Inc., a Pennsylvania nonprofit corporation founded in 1927 which operates approximately 15 facilities directed primarily toward health care, housing and community services for the elderly in four states. Pursuant to a Use and Option Agreement, a copy of which is on file with the Court, PSS will have an option to purchase the Reorganized Notchcliff Community. The Reorganized Notchcliff Community will continue to be a continuing care community under the jurisdiction of the Office on Aging of the State of Maryland but will no longer be offering lifecare contracts to residents of the reorganized community.

On September 7, 1990, the Trustee filed a Motion for Approval of Preliminary Marketing Program for Proposed Reorganized Notchcliff Facility pursuant to which the Trustee seeks Court approval of a preliminary marketing program for the proposed reorganized Notchcliff facility under the sponsorship of PSS for a period of approximately three months (that is through December 1, 1990). During the preliminary marketing period, the Trustee would be the nominal party to sign provisional contracts for the reorganized facility with prospective new residents and present Notchcliff residents who elect to stay at the reorganized facility, which contracts would become effective and be assigned to PSS only upon Office on Aging review and approval of the success of the preliminary marketing program and Bankruptcy Court approval of the Plans. By letter dated August 24, 1990, the Office on Aging conditionally approved the proposed preliminary marketing program for the proposed reorganized facility under the sponsorship of PSS.... [O]peration of the reorganized facility would not commence until receipt of final Office on Aging approval that the proposed new community has met certain marketing and financial feasibility criteria, and the Effective Date of the Freestate and Notchcliff Plans has been conformed thereto.

In connection with the proposed preliminary marketing program, the Trustee filed a Motion for Order Authorizing Borrowing for Preliminary Marketing Program on Superpriority Basis pursuant to which the Trustee would be borrowing $66,000, one-half from The Commercial Bank and one-half from the Presbytery of Baltimore, to fund the preliminary marketing program. Such funding would ensure that the preliminary marketing program would not be funded by the escrowed monies of the Notchcliff residents ...

Disclosure statement [P. 160], 4–6, 11–14.

9. The confirmed plan in the Notchcliff case contained six classes as follows:

*Class I—Unpaid administrative claims* [Unimpaired]

The plan provides that all pre-confirmation superpriority claims and all claims of The Commercial Bank for post-confirmation superpriority advances share an equal

---

1. "'C.B. Properties' shall mean C.B. Properties, Inc., a Maryland corporation and a wholly-owned subsidiary of The Commercial Bank, to which the 'Notchcliff Operating Assets' [Notchcliff real property, all equipment and other tangible personal property owned by Notchcliff comprising the Notchcliff Lifecare Community or otherwise located at the Notchcliff real property, the Notchcliff name and tradename and goodwill] [were] transferred pursuant to the provisions of this Plan." Trustee's Amended Plan of Reorganization [P. 159], ¶ 1.5.

priority over every other allowed claim in Class I.

*Class II—Unpaid priority claims* [Unimpaired]

*Class III—Unpaid tax claims* [Unimpaired]

*Class IV—Secured claim of The Commercial Bank* [Impaired]

This class consists of the secured claim of The Commercial Bank subject to participating lenders which is secured by the subordinated pre-confirmation deeds of trust on the Notchcliff real property and which is settled, acknowledged and stated in the amount of $13,000,000 ... C.B. Properties will, on the effective date, receive the Notchcliff real property (a) subject to the renovation/ remarketing loan and (b) subject to the pre-confirmation deeds of trust modified to reflect the obligation of Notchcliff to repay the Class IV secured claim in the amount of $13,000,000 together with the repayment to The Commercial Bank of its pre-confirmation superpriority claims and the post-confirmation superpriority advances. After the effective date, C.B. Properties shall pay the Class IV secured claim to the holder of the Class IV secured claim in accordance with terms agreed to between C.B. Properties, The Commercial Bank and PSS. Disclosure Statement [P. 160], 23–24.

*Class V—All Unsecured Claims* [Impaired]

The holders of Class V allowed claims will be paid in cash on a *pro rata* basis from the Notchcliff Creditor Distribution Fund in accordance with Paragraphs 6.6 and 6.7 of the Notchcliff Plan as full and final satisfaction of such claims. Included in the Class V claims is the unsecured portion of The Commercial Bank claim which has been allowed as provided in the amount of $9,268,572. *Id.,* 24.

*Class VI—Notchcliff Interests* [Impaired]

The holders of interests in Notchcliff receive nothing under the plan. Their interests terminate on the effective date.

10. The Commercial Bank has asserted that Paragraph 6.11 of the confirmed Chapter 11 plan [P. 159] in the Notchcliff case furnishes this Court a jurisdictional base for the subject matter of the instant complaint. Paragraph 6.11 provides as follows:

6.11 At any time after the Confirmation Date and before the entry of an order closing the Notchcliff Case, the Court may, after Post–Confirmation Notice, enter an order in the Notchcliff Case activating the Notchcliff Partners Release Fund. If the Notchcliff Partners Release Fund is so activated, the Trustee and a Contributing Notchcliff Partner may, subject to Court approval after Post–Confirmation Notice, enter into a Notchcliff Contribution Agreement providing for contributions, at settlement amounts negotiated between the Trustee and the Contributing Notchcliff Partner, to be made by the Contributing Notchcliff Partner to the Notchcliff Partners Release Fund. Such contributions to the Notchcliff Partners Release Fund shall be made for the purpose of releasing claims against any Contributing Notchcliff Partner by (a) the Trustee and creditors holding claims against such Contributing Notchcliff Partner by reason of such Contributing Notchcliff Partner having been a general partner in Notchcliff and (b) creditors holding personal guarantees or other claims against such Contributing Notchcliff Partner with respect to debts of Notchcliff. Any such Notchcliff Contribution Agreements may provide that any amounts paid by the Contributing Notchcliff Partner will only be available for distribution to those holders of Notchcliff Claims who have claims against that particular Contributing Notchcliff Partner and who agree in writing to participate in the Notchcliff Partners Release Fund with respect to said Contributing Notchcliff Partner and release said Contributing Notchcliff Partner from any and all claims described in subparagraphs 6.11(a) and (b) above. Receipt of a distribution from the Notchcliff Partners Release Fund with respect to a particular Contributing Notchcliff Partner shall automatically operate as a release of that particular Contributing

Notchcliff Partner, as provided in the preceding sentence, by any Notchcliff creditor holding a claim and agreeing in writing to participate with respect to that particular Contributing Notchcliff Partner. Each creditor who consents in writing to participation in distributions from the Notchcliff Partners Release Fund with respect to a particular Contributing Partner will be paid in cash on a *pro rata* basis in accordance with the amount of that creditor's Class V Allowed Claim against Notchcliff, except as to funds to be transferred to the Notchcliff Creditor Distribution Fund should The Commercial Bank consent to participation in distributions from the Notchcliff Partners Release Fund. If The Commercial Bank consents to participation in distributions from the Notchcliff Partners Release Fund, the Trustee shall be authorized to transfer sufficient proceeds from the Notchcliff Partners Release Fund to the Notchcliff Creditor Distribution Fund as necessary to pay all remaining Allowed Claims against Notchcliff in Classes I, II and III together with allowed Liquidating Expenses. If any Contributing Notchcliff Partner defaults or otherwise fails to perform any of the obligations undertaken in his Notchcliff Contribution Agreement, then the release to said defaulting partner from each creditor shall be null and void and all claims of such creditors against said defaulting partner shall automatically be revived in all respects. The order activating the Notchcliff Partners Release Fund, and subsequent orders of the Court, may provide additional terms, conditions and provisions of said Fund.

Trustee's Amended Plan of Reorganization [P. 159], ¶ 6.11.

11. Additionally, The Commercial Bank claimed that the order confirming plan [P. 202] dated November 27, 1990 furnishes a basis for the subject matter jurisdiction of the bankruptcy court over this complaint in the sixth decretal paragraph of the order, which provides as follows:

... ORDERED, that the Trustee should be, and he hereby is, AUTHORIZED and EMPOWERED to request this Court to enter one or more orders, at any time after the Confirmation Date and before the entry of an order closing this case, activating and implementing the Notchcliff Partners Release Fund as described in the Plan[.]

Order [P. 202] dated November 27, 1990. So far as this Court is aware, the trustee has to date made no such request.

12. The Bank alleged in its response to a show cause order [P. 10] that "the Bank and the Trustee have agreed that the Bank should pursue this adversary proceeding and that any recoveries, whether obtained by settlement or adjudication, shall be contributed to the Notchcliff Partners Release Fund." *Id.*, ¶ 2. To date, no written agreement to this effect has been offered in evidence by the parties.

13. The trustee filed a memorandum [P. 12] in support of the plaintiff's contention that subject matter jurisdiction exists in this Court to decide the pending controversy. The trustee stated in his memorandum:

[2.] As stated by the Bank in its Response, any recovery received in this adversary proceeding, whether by settlement or adjudication, will be deposited into the Notchcliff Partners Release Fund for distribution by the Trustee to creditors of the estate in accordance with ¶ 6.11 of the Trustee's Amended Plan of Reorganization.

[3.] Because this adversary proceeding has been brought directly for the benefit of this estate and its creditors, this Court clearly has subject matter jurisdiction over this case.

Trustee's memorandum [P. 12], ¶¶ 2 and 3.

14. Paragraph 6.4 of the Notchcliff plan provides as follows:

6.4(a) The Order of Confirmation shall not revest title to the Retained Assets in the Debtor, *but such assets shall remain property of the estate subject to administration by the Trustee, on behalf of the Debtor, in accordance with the terms of this Plan. The Trustee shall continue to serve herein and shall be authorized to wind up the affairs of*

the estate in an orderly manner. At all times after the Confirmation Date, the Trustee shall continue to be vested with all of the rights and powers of a trustee under the Bankruptcy Code, including, without limitation, all of the avoidance and other powers of a trustee to recover property of the bankruptcy estate set forth in § 541 through § 554 of the Bankruptcy Code. In addition, the Trustee shall continue to be vested with the power and authority to act on behalf of the Debtor in place of the holder of any interest. It is expressly understood and agreed that the allowance of The Commercial Bank's Class V Unsecured Claim shall be without prejudice to any claims of the Trustee.

(b) At all times after the Effective Date, the Trustee shall continue to take such actions as the Trustee deems appropriate and advisable to collect, recover and liquidate the Retained Assets. The Trustee will account for all property received, continue to investigate the financial affairs of the Debtor, and examine proofs of claims and object to the allowance of any claim that is improper if a purpose would be served thereby. The Trustee shall from time to time after the Effective Date pay from the Debtor's estate such Liquidating Expenses as are approved by order of the Court after having given Post–Confirmation Notice. In addition, the Trustee may make sales or other dispositions of assets after the Effective Date subject to Court approval after having given Post–Confirmation Notice. In connection with his winding up of the Debtor's business and financial affairs and liquidation of the Retained Assets, the Trustee will be compensated on an hourly basis for his services as Trustee, will continue to retain his current counsel on general retainer to provide legal services to the Trustee and will employ such other persons, including professionals, and enter into such agreements as he deems advisable for the prompt and economical conclusion of his duties under this Plan. The Liquidating Expenses shall have a first priority in payment from the Notchcliff Creditor Distribution Fund, ahead of the Pre–Confirmation Superpriority Claims and Post–Confirmation Superpriority Advances, which shall have second priority in distribution, followed thereafter by any remaining Class I Allowed Claims, then by any remaining Class II Allowed Claims, then by any remaining Class III Allowed Claims, and finally by any Class V Allowed Claims. At the time of each proposed distribution from the Notchcliff Creditor Distribution Fund and at such other times as the Trustee proposes to make payment therefrom, the Trustee will account to the Court for all Liquidating Expenses as of that date and will obtain, after having given Post–Confirmation Notice, the approval of the Court for the payment of compensation and expenses to the Trustee and to all professional persons to whom the Trustee proposes to make payment.

*Id.* [Emphasis supplied.]

15. Paragraph 6.10 of the Plan provides, in part, that "[b]ecause the Debtor is liquidating pursuant to the provisions of this Plan and the Bankruptcy Code, no further notice or action under any state or federal law shall be required to terminate the existence of the Debtor after the final distributions are made from the Notchcliff Creditors Distribution Fund." *Id.*

16. Article VIII of the Plan contains provisions relating to the jurisdiction of this Court. Paragraph 8.2 is of particular relevance to the instant complaint:

8.2 Determination of all questions and disputes regarding title to assets of the Notchcliff estate, approval of distributions and payments from the Notchcliff Creditor Distribution Fund and the Notchcliff Partners Release Fund, and determination of all causes of action, controversies, disputes, conflicts or claims between the Debtor or the Trustee and any other party, including, but not limited to, *all litigation or contested matters pending before the Court on the Confirmation Date,* any litigation or contested matters filed subsequent to the Confir-

mation Date (including, without limitation, actions to avoid preferential transfers or to recover fraudulent transfers or fraudulent conveyances), and any right of the Debtor or the Trustee to recover assets or collect receivables.

*Id.* [Emphasis supplied.]

17. The instant complaint was pending before this Court on the date of confirmation. However, the complaint makes absolutely no reference to the terms of the confirmed plan (including the Notchcliff Partners Release Fund or the Notchcliff Creditor Distribution Fund), nor to the terms of the confirmation order quoted above. As indicated, the complaint, which is entitled "Adversary Proceeding for Damages," was filed in this Court *before* the Chapter 11 plan was confirmed. The jurisdictional reference set forth in the complaint is "28 U.S.C. §§ 157(a) and 1334(b) and [Local District] Rule 402." Complaint, ¶ 1. Count II indicates that it is based upon Section 9–307 and other provisions of the Maryland Uniform Partnership Act [Md. Corps. & Assns. Code Ann.]. Complaint, ¶ 15.

18. The confirmed plan contains no provision relating specifically to the right of The Commercial Bank to bring the instant complaint or designating the Bank to sue the nondebtor partners on its own behalf or that of the trustee.

19. The defendants, Chester L. Price and Richard D. Poteet, have not filed bankruptcy petitions in this Court, but are being sued by the Bank in their capacities as general partners and guarantors of the debtor partnership.

## CONCLUSIONS OF LAW

■ 1. This Court lacks subject matter jurisdiction over this lawsuit brought by a Chapter 11 partnership creditor against nondebtor general partners arising from their personal guaranties of debts owed by the debtor partnership.

2. Indeed, no reported case has been found in which a bankruptcy court entertained a complaint such as the one filed in the case *sub judice*. *In re Xonics*, 813 F.2d 127 (7th Cir.1987), which was cited by the Bank, is factually dissimilar and is therefore unpersuasive on this issue.

■ 3. Paragraph 8.2 of the plan, which provides for retention of jurisdiction over "all litigation or contested matters pending before the court on the Confirmation Date," is not sufficient to confer subject matter jurisdiction on the bankruptcy court where such subject matter jurisdiction has been determined to be lacking. The plan provision does not bind this Court (or the U.S. District Court) from making a determination of its own subject matter jurisdiction at any time. Subject matter jurisdiction may not be conferred upon this Court by the consent of the parties who voted in favor of the plan.

■ 4. The defendants' consent to jurisdiction contained in ¶ 4.1(a) of the personal guaranty agreements is likewise insufficient to confer subject matter jurisdiction upon this Court where such subject matter jurisdiction does not exist in the absence of such consent. The Court may question its own jurisdiction regardless of whether the defendants are legally estopped from objecting to the subject matter jurisdiction of the bankruptcy court by reason of the terms of the guaranties.

■ 5. The retention of jurisdiction provided for in the plan and confirmation order over certain plan provisions did not create a jurisdictional base for any and all actions unrelated to the debtor's estate which might be filed by a partnership creditor against the partnership's individual guarantors who were also general partners.

6. Because The Commercial Bank is the largest secured creditor and also the largest unsecured creditor in this case, and because it even enjoys a priority over administrative claimants in Class I of the confirmed plan, it is not apparent that any recovery by The Commercial Bank will benefit the other creditors of the estate.

7. The Commercial Bank is not obligated by any order of this Court or agreement of record to remit to the trustee the proceeds from any recovery it may obtain from the defendants.

■ 8. The consensual payment by The Commercial Bank to the trustee of any recovery obtained from the defendants and the trustee's agreement to remit the recovery back to the plaintiff does not create a jurisdictional base for this Court to entertain the instant lawsuit by which the recovery is to be obtained.

9. The filing of the instant complaint is not a prerequisite to the activation of the Notchcliff Partners Release Fund. Paragraph 6.11 of the confirmed plan merely sets forth a convenient mechanism for the *settlement* of claims by participating creditors of the debtor who *consent* to participate in such settlement. *Indeed, the cited provision does not even purport to furnish a basis for the adjudication by this Court of suits brought by creditors against nondebtors.*

10. The instant complaint which is based upon the partners' guaranties (which are not property of the partnership estate) is distinguishable from a lawsuit which might have been brought by the bankruptcy trustee against nondebtor partners to recover partnership deficiencies because such a cause of action *would have been property of the estate.*

■ 11. Property of the estate of a partnership that is in bankruptcy does not include nonpartnership property separately owned by the debtor's general partners. *In re Lima Days Inn, Ltd.,* 10 B.R. 173 (Bankr.N.D.Ohio 1981).

■ 12. In spite of Conclusion of Law No. 11, "[w]hen partnership assets are insufficient to pay all allowed partnership claims, § 723 gives a partnership trustee the right to recover the deficiency from the general partners who are personally liable on the claims." *In re R.L. Kelly & Sons, Millers,* 125 B.R. 945, 950 (Bankr.D.Md.

1991); 11 U.S.C. § 723(a). "[A]ny interest in property that the trustee recovers under Section 723 is property of the estate." 4 *Collier on Bankruptcy* ¶ 723.01 (15th ed. 1991), citing 11 U.S.C. § 541(a)(3).

13. Section 723, however, has been held to confer no such authority upon a Chapter 11 trustee because Section 103 of the Bankruptcy Code limits the applicability of Section 723 to Chapter 7 cases. *In re Kaveney,* 60 B.R. 34 (9th Cir.B.A.P.1985); *In re Monetary Group,* 55 B.R. 297 (Bankr. M.D.Fla.1985); *In re I–37 Gulf Ltd. Partnership,* 48 B.R. 647 (Bankr.S.D.Tex.1985). This Court has found no case to the contrary.

14. Where the rights of a Chapter 11 partnership trustee to sue nondebtor partners in the bankruptcy court for the apparent benefit of the estate has been questioned, how much more precarious is the right of a Chapter 11 partnership creditor to sue nondebtor partners in the bankruptcy court upon the creditor's personal cause of action which will arguably confer no benefit upon the estate?

15. Despite the contrary decisions cited in Conclusion of Law No. 13, Professor Frank R. Kennedy and Gerald K. Smith have argued persuasively that a Chapter 11 partnership trustee should have the same authority to proceed against nondebtor general partners to recover partnership deficiencies as a trustee of a partnership in Chapter 7,[2] based upon the legislative history of Section 723 coupled with the requirement of Section 1129(a)(7) that creditors in a Chapter 11 case must receive or retain under the plan as much as they would in a Chapter 7 case.

16. "The liability of the general partners under Section 723(a) should be compared to that under Section 40[3] of the

---

2. Kennedy and Smith *Some Issues in Partnership and Partner Bankruptcy Cases and Recommendations For Legislative Change,* Norton's 1990 Annual Survey of Bankruptcy Law 1, 22–25. The full text of the portion of the article relevant to this case is excerpted in the appendix to this opinion, *infra.*

3. This section of the Uniform Partnership Act corresponds to Section 9–611 of the Maryland Uniform Partnership Act, Md.Corp. & Assn.Code Ann. § 9–101 *et seq.* Section 9–611(1) provides:

In settling accounts between the partners after dissolution, the following rules shall be

Uniform Partnership Act which gives a partnership the right to compel contributions from the partners. The rights of the partnership trustee under Section 544(a) of the Bankruptcy Code are only on this chose in action and not on the partner's property directly. The chose in action passes to the partnership estate under Section 541(a) and may be enforced under Section 40 of the Uniform Partnership Act to the extent of any deficiency, whether or not the partner is a debtor under title 11 ..." 4 *Collier on Bankruptcy* ¶ 723.02 (15th ed. 1991).

■ 17. The Court notes that the confirmed plan of liquidation specified that after confirmation, the trustee would "continue to be vested with all of the rights and powers of a trustee under the Bankruptcy Code," including the powers conferred in Code Sections 541 through 544 to enhance the bankruptcy estate. Plan, ¶ 6.4, quoted in Finding of Fact No. 14, *supra.* This plan provision is sufficient to clothe the trustee with the authority to proceed against the nondebtor general partners in this Court.

■ 18. The bankruptcy court would have subject matter jurisdiction of the Chapter 11 trustee's complaint against nondebtor general partners of a liquidating Chapter 11 partnership debtor because the complaint would be a core proceeding arising under title 11 "concerning the administration of the estate," "orders to turn over property of the estate," "confirmations of plans," and "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor relationship." 28 U.S.C. § 157(b)(2)(A), (E), (L) and (O) (1988).

■ 19. Assuming that The Bank's cause of action against the partners as guarantors on their guaranties *were* identical to the trustee's cause of action against the same defendants as general partners for partnership deficiencies, the question arises as to whether The Commercial Bank could bring the instant complaint in the bankruptcy court as the trustee's representative by the terms of their private agreement.

20. Section 1123(b)(3)(B) of the Bankruptcy Code provides that a Chapter 11 plan may provide for "the retention and enforcement by the debtor, by the trustee, *or by a representative of the estate appointed for such purpose,* of any such claim or interest [belonging to the debtor or to the estate][.]" [Emphasis supplied.] 11 U.S.C. § 1123(b)(3)(B) (1988). The plan in the instant case did not appoint The Commercial Bank as the representative of the trustee or the debtor to pursue a claim of this partnership estate for deficiencies against its partners. Indeed, the plan specifically provided that "the Trustee shall continue to be vested with the power and authority to act on behalf of the Debtor in place of the holder of any interest." ¶ 6.4(a). The approval of this Court has not been sought to appoint The Commercial Bank as a representative of the bankruptcy estate to pursue claims of the estate against the partnership debtor's general partners.

21. Under all of the circumstances, the Court concludes that The Commercial Bank has not been appointed as a representative of the bankruptcy estate to file the instant complaint in the bankruptcy court. *Cf. Citicorp Acceptance Co., Inc. v. Robison (In re Sweetwater),* 884 F.2d 1323 (10th Cir. 1989); *Nordberg v. Sanchez (In re Chase & Sanborn Corp.),* 813 F.2d 1177 (11th Cir.1987); *Temex Energy v. Hastie and Kirschner (In re Amarex, Inc.),* 96 B.R. 330 (W.D.Okla.1989); *In re Kroh Bros. Dev. Co.,* 100 B.R. 487 (Bankr.W.D.Mo. 1989); *In re AOV Industries, Inc.,* 62 B.R. 968 (Bankr.D.D.C.1986).

■ 22. Section 508(b) of the Bankruptcy Code does not preclude The Commercial Bank as a secured creditor of the nondebtor general partners from pursuing them on their personal guaranties in a state court while sharing in distributions

observed, subject to any agreement to the contrary.
(1) The assets of the partnership are:
(i) The partnership property; and

(ii) The contributions of the partners necessary for the payment of all liabilities specified in paragraph (2) of this section.
*Id.*

from the estate of a partnership in the bankruptcy court.[4]

■■■ 23. There has been no necessity demonstrated by the parties for this Court to entertain this lawsuit. It is apparent that the state court is the proper forum for this litigation. The instant complaint in its present form is beyond the subject matter jurisdiction of the bankruptcy court and will accordingly be dismissed. The dismissal, however, is without prejudice to the filing by the Chapter 11 trustee of a complaint against the same or additional defendants pursuant to Section 723 based upon contributions owed by them as general partners to the bankruptcy estate.[5]

ORDER ACCORDINGLY.

## APPENDIX

Kennedy and Smith, *Some Issues in Partnership and Partner Bankruptcy Cases and Recommendations For Legislative Change*, Norton's 1990 Annual Survey of Bankruptcy Law 1, 22–25.

## CONTRIBUTIONS OF PARTNERS TO REORGANIZATION PLAN OF PARTNERSHIP

The Bankruptcy Code does not make any direct or specific provision for partnership reorganization plans. Thus, it is not clear from the statute whether a partnership plan may or should include assets of the partners as well as those of the partnership. A standard of confirmation of any plan, however, is that each creditor shall receive or retain under the plan an amount of property not less in value than would have been received or retained in a liquidation under the Code. Section 723(b) entitles the creditors of a partnership to distribution not only from the partnership assets but also from the assets of the partners when there is a deficiency of partnership assets. The amount recoverable from the partners' assets may vary, depending on a number of factors, including the diligence of the trustee of the partnership (or more likely the debtor-in-possession) in its pursuit of the partners' assets in competition with the creditors of the partners or with their trustee. As the House Report accompanying the bill that became the Bankruptcy Reform Act recognizes, Section 1129(a)(7) renders Section 723 of critical relevance in determining the confirmability of a partnership plan. The Code does not impose on the trustee or debtor-in-possession the duty of collecting the assets of the partnership estate in a Chapter 11 or Chapter 12 case, but each holder of a claim or interest is entitled to object to the confirmation of a plan that does not give the holder at least as much value as would have been obtainable in a liquidation under Chapter 7 on the effective date of the plan. Bankruptcy Rule 1007(g), which authorizes the court to "order any general partner to file a statement of personal assets and liabilities with the court," has been recognized as an appropriate aid to the court in

---

**4.** Section 508(b) provides as follows:

If a creditor of a partnership debtor receives, from a general partner that is not a debtor in a case under Chapter 7 of this title, payment of, or a transfer of property on account of, a claim that is allowed under this title and that is not secured by a lien on property of such partner, such creditor may not receive any payment under this title on account of such claim until each of the other holders of claims on account of which such holders are entitled to share equally with such creditor under this title has received payment under this title equal in value to the consideration received by such creditor from such general partner.

11 U.S.C. § 508(b) (1988).

**5.** The question of the entitlement of these defendants to a trial by jury must await the determination by the trustee of whether or not to file an amended complaint in this Court. However, in light of the decision of the U.S. Supreme Court in the case of *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), it is noteworthy that at least one bankruptcy court has spoken *in dicta* to the effect that bills for the administration of partnership assets and proceedings for the winding-up of partnerships were filed in equity where jury trials have historically been unavailable. *In re Bell & Beckwith,* 112 B.R. 863, 867 (Bankr. N.D.Ohio 1990). The proceeding in that case involving a complaint by a partnership trustee against nondebtor general partners was decided on summary judgment and the right to jury trial was denied on the ground that there were no genuine issues of material fact to be tried before a jury. *Id.*

determining the confirmability of a partnership plan of reorganization.

At the minimum the Code affords the creditors of the partnership leverage to enforce the recovery of contributions from the partners when a deficiency of partnership assets to meet its obligations develops. As the House Report pointed out, the partnership trustee in a reorganization case will have available Section 541(a) as an avenue of recovery. The Report might well have also cited Section 544(a)(1), which vests the trustee with

> "the rights and powers of ... a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists."

The right of the partnership trustee to proceed against the general partners in a Chapter 11 and 12 case is supported by Section 40 of the Uniform Partnership Act. Section 40(a) includes in its listing of assets of a partnership "[t]he contributions of the partner necessary for the payment of all the liabilities" of the partnership. Section 15 of the Uniform Partnership Act further declares that all partners are liable jointly and severally for partnership obligations that arise out of a partner's wrongful act or breach of trust and are liable jointly for all other debts and obligations of the partnership.

Although two cases have recognized the roles of Section 723 and Bankruptcy Rule 1007(g) in determining the confirmability of a Chapter 11 plan for the reorganization of a partnership, [*In re I–37 Gulf Ltd. Partnership*, 48 B.R. 647, 650 (Bankr.S.D.Tex. 1985) and *In re Monetary Group*, 55 B.R. 297 (Bankr.M.D.Fla.1985) ], they declined to regard Section 723 as a sufficient basis for granting relief against partners in the form of indemnification of the partnership debtor or an order of turnover of nonpartnership assets. Both Courts ignored the legislative history of Section 723. The first

Court read Section 40 of the Uniform Partnership Act narrowly, restricting its application to the settling of accounts between partners but without explaining why the Act referred to the contributions as "necessary for the payment of all the liabilities" to creditors. [48 B.R. at 450.] The second case followed the first and added that the trustee's invocation of Section 105 of the Code was an attempt to circumvent the "express and narrow prescriptions of § 103(b)" [55 B.R. at 299.] that confine the applicability of Section 723 to Chapter 7 cases. The Court nevertheless added the following cryptic sentence at the end of its discussion of the availability of relief to the trustee: "Procedurally, if the trustee intends to seek pure equitable relief under § 105 then Bankruptcy Rule 7001 requires the matter to be brought as an adversary proceeding." [*Id.*]

Robert Rosenberg in his article, "Partnership Reorganization Under the Bankruptcy Reform Act: Filling in the Interstices," [56 N.Y.U.L.Rev. 1773 (1981) ], expresses ambivalent views with regard to enforcing liability of partners for contributions to a partnership reorganization plan. The article first recognizes that Section 15 of the Uniform Partnership Act authorizes the trustee or debtor-in-possession in a Chapter 11 case to assert a cause of action against the partners for contribution. [*Id.* at 1179–80.] He considers, however, the possibility that partners' liability to partnership creditors may not be drawn upon in any way in a reorganization case and concludes mysteriously that a "possibly better reading" would permit a debtor-in-possession to pursue partners for contributions to a plan without being bound to look to nonbankrupt partners first. [*Id.* at 1191–2.] At a still later point he argues that when partnership creditors file an involuntary petition against the partnership under Chapter 11, they should be deemed to have waived any right to the partners' assets. [*Id.* at 1201.] "To force petitioning creditors to choose between obtaining the right of contribution in a liquidation and reorganizing the entity without contribution from the partners unless voluntarily made is, in this author's view, totally unobjectionable

and consistent with the entity premise of the bankruptcy laws." [*Id.* at 1201 n. 146.] The reader is left to conjecture as to the author's views as to the rights and burdens of the parties respecting the partners' assets when the Chapter 11 petition is filed by the partnership or by less than all the partners.

Rosenberg observes that "compliance with the best interests test can be readily achieved without contributions from the partners through a payout over time in which the present value of the payout is at least as much as the best interests' baseline." [*Id.* at 1201, n. 143.] The pertinence as well as the accuracy of that observation will depend of course on whether the partnership assets and income will suffice to meet the total yielded by inclusion of substantial net assets of the partners in the "best interests" calculation, and whether a prolonged payment is feasible. Rosenberg suggests that "[a] rule in favor of forced contributions to a partnership plan would be akin to involuntary servitude." [*Id.* at 1200.] It is not clear why compulsory participation of a partner in a partnership plan is any closer to "involuntary servitude" than compulsory participation in a creditor's plan for the partner as an individual. It may be involuntary servitude, however, to require a partner to remain in the relationship of a partner and incur liability for postconfirmation obligations. The partner's objections should not defeat or prevent the consummation of a plan that calls for a contribution from the partner in order to enable the plan to satisfy the requirements of Section 1129 with respect to preconfirmation obligations. *In any event, the right of the trustee of a partnership or of a partnership as a debtor-in-possession to recover and apply contributions from partners should not be seriously controverted in a Chapter 11 plan that is a liquidation.* [*See* Zaretsky, "Co–Debtor Stays in Chapter 11 Bankruptcy," 73 Cornell L.Rev. 213, 257 (1988) ].

*Id.,* 22–25. [*Some footnotes omitted.*] [*Emphasis supplied.*]

## ORDER DISMISSING COMPLAINT FOR WANT OF SUBJECT MATTER JURISDICTION

Based upon the Memorandum Opinion entered simultaneously herewith, it is

ORDERED that the instant complaint is hereby DISMISSED WITHOUT PREJUDICE to the filing by the Chapter 11 trustee of an amended complaint.