In re DOLLAR ASSOCIATES, a California limited partnership, Debtor.

**Bankruptcy No. 94–3–1049–TC.**

United States Bankruptcy Court, N.D. California.

Oct. 4, 1994.

946

Jeffrey P. Meyer, Emily Brower Miller, Pircher, Nichols & Meeks, Los Angeles, CA, for Gold Coast Asset Acquisition, L.P.

Donald E. Sloan, Kathryn A. Coleman, Desmond J. Cussen, Gibson, Dunn & Crutcher, San Francisco, CA, for debtor Dollar Associates a California Ltd. Partnership.

## OPINION

THOMAS E. CARLSON, Chief Judge.

Debtor, whose sole asset is an office building that is substantially overencumbered, attempts to confirm a plan of reorganization under the "new value" exception to the absolute priority rule. I conclude that the plan is not fair and equitable, whether or not it satisfies the new value exception, because it does not serve recognized goals of reorganization, and because it would unduly undermine the provisions of the Bankruptcy Code restricting a debtor's ability to reduce the amount of a lien through a court's valuation of the collateral. Because Debtor is unable to confirm a plan of reorganization, I grant the secured creditor's cross motion for relief from the automatic stay.

## FACTS

Debtor is a California limited partnership that owns an office building in downtown San Francisco (the Office Building). The Office Building is subject to a deed of trust securing a nonrecourse promissory note with a balance of approximately $18.5 million (the Note). California Federal Savings sold the Note to Gold Coast Asset Acquisition, L.P. (Gold Coast) in November 1993 for $10.7 million. The Note matured on February 1, 1994. Debtor was unable to pay or refinance the Note upon maturity and was also unable to agree with Gold Coast upon a consensual restructuring of the Note. Debtor filed a petition under chapter 11 of the Bankruptcy Code on March 15, 1994.

In addition to the Note, Debtor owed the following debts on the petition date: (1) $181,196 in unsecured claims of creditors who provided goods and services to the Office Building; (2) a $24,545 secured claim incurred in purchasing an automobile forty-one days before the petition was filed; (3) a $11,400 secured claim incurred in purchasing a photocopier forty-two days before the petition was filed; and (4) a $3,170 claim incurred in purchasing a facsimile machine forty-seven days before the petition was filed.

Debtor filed a plan of reorganization and disclosure statement on the petition date. The key provisions of Debtor's plan follow from Debtor's contention that the Office Building has a present fair market value of $8.0 million. In payment of its secured claim, Gold Coast would receive a ten-year, interest-bearing note in the amount of $8.0 million, secured by a deed of trust on the Office Building. In payment of its unsecured claim, Gold Coast would receive a ten-year, interest-bearing unsecured note for 15 percent of its $10.5 million deficiency claim. The other unsecured creditors, which Debtor describes as Necessary Service Providers, would be classified separately and would receive 85 percent of their claims on the effective date of the plan. The claims secured by the automobile, photocopier, and facsimile machine would be paid in full with interest.[1] Debtor would retain the Office Building. The partnership interests of existing equity holders would be cancelled. Those equity holders, however, would contribute $1.0 million in cash to Debtor on the effective date of the plan and would receive 100 percent of the equity interest in the reorganized Debtor.

The $1.0 million capital investment would be used to pay part of the cost of seismic strengthening of the Office Building. The remaining $4.0 million cost of that project would be funded from operating income.

---

1. The disclosure statement and plan state that these classes are impaired, but do not specify the manner in which the rights of the creditors are altered.

Under Debtor's projections, net operating income from the Office Building exceeds debt service on the $8.0 million Note by approximately $5.0 million over the first six years of the plan (Excess Net Operating Income).[2]

The court approved Debtor's disclosure statement and authorized Debtor to solicit votes from creditors. The class representing the unsecured claims of Necessary Service Providers voted to accept the plan, as did the three classes representing the claims secured by the automobile, photocopier, and facsimile machine. The classes representing Gold Coast's $8.0 million secured claim and Gold Coast's $10.5 million unsecured claim voted to reject the plan. Unsecured claims rejecting the plan constituted 98.5 percent of the total amount of unsecured claims voting. During the balloting period, Gold Coast offered to purchase all the secured and unsecured claims listed by Debtor in its disclosure statement for 100 percent of face value. Debtor contacted those creditors, asking them not to sell their claims to Gold Coast. Five unsecured creditors, with claims totalling $3,950, sold their claims to Gold Coast.

The court bifurcated the confirmation hearing. On June 9, 1994, the court considered whether Gold Coast could block confirmation of the plan as a matter of law. The court reserved for another hearing all disputed factual questions, including the value of the Office Building,[3] and the rate of interest Gold Coast should receive on its secured claim.

At the conclusion of the June 9, 1994 hearing, the court held that Debtor's Second Amended Plan was unconfirmable as a matter of law. The court first concluded that the plan was not fair and equitable with respect to the secured claim of Gold Coast, because Gold Coast would receive less than half of the net operating income of the building,

although the Note was not being paid in full. The court also held that the plan imposed the risks of reorganization on Gold Coast, without affording Gold Coast the benefits of a successful reorganization. Because of the 100 percent loan-to-value ratio on the new $8.0 million Note, Gold Coast would bear the entire loss from any subsequent decline in value. Yet Gold Coast would not share in any subsequent appreciation in value. The court next held that the plan was not fair and equitable with respect to the $10.5 million unsecured deficiency claim of Gold Coast, because the plan provided minimal benefits to accepting creditors, because it did not preserve any jobs or going business, because Gold Coast was not paid nearly in full (15 percent), because 98.5 percent of all unsecured claims by amount had voted to reject the plan, and because the plan improperly discriminated against Gold Coast by paying only 15 percent of its unsecured claim while paying 85 percent of the claims of the Necessary Service Providers.[4] The court afforded Debtor time to file a new plan, but warned Debtor that if that plan was not confirmed, Debtor probably would not be afforded a third opportunity to confirm a plan.

On June 28, 1994, Gold Coast filed a motion seeking relief from the automatic stay permitting it to foreclose upon the Office Building. Debtor filed its Third Amended Plan of Reorganization on August 4, 1994. Both matters were set for hearing on August 26, 1994.

Debtor's most recent plan alters the treatment of the Necessary Service Providers, and both the secured and unsecured claims of Gold Coast. The Necessary Service Providers would still be paid 85 percent of their claims, but 70 percent of the claims would now be paid by the general partners rather than the estate. In payment of its secured

2. This Excess Net Operating Income results from the Debtor's proposed reduction of Gold Coast's secured claim from $18.5 million to $8.0 million. The net operating income is not sufficient to pay the contractual rate of interest on the full $18.5 million obligation.

3. Debtor contends the value of the Office Building is $8.0 million. Gold Coast contends the value is $14.0 million.

4. Debtor acknowledged that it could obtain from other sources the goods and services supplied by the so-called Necessary Service Providers.

claim, Gold Coast would receive: (1) the $8.0 million interest-bearing note provided under the original plan; and (2) an interest-free note equal to the amount of Excess Net Operating Income spent on seismic strengthening (estimated to be $4.0 million). In payment of its $6.5 million unsecured deficiency claim, Gold Coast would receive: (1) the unsecured note for 15 percent of the deficiency provided under the original plan; and (2) a share of future appreciation in the building. Future appreciation in the building would be divided into two parts—that attributable to the seismic strengthening and that attributable to general market conditions. Debtor would leave it to the court to determine what portion of total appreciation was attributable to each factor. Gold Coast would receive a percentage of the appreciation attributable to seismic strengthening equal to the percentage of total seismic strengthening costs funded from Excess Net Operating Income.[5] Debtor would leave it to the court to determine what portion of the appreciation resulting from general market conditions Gold Coast should receive.

Once again, the court bifurcated the confirmation hearing. The court heard oral argument on August 26, 1994 as to whether the plan was unconfirmable as a matter of law.

5. Debtor projects that the total cost of the seismic strengthening would be $5.0 million, and that $4.0 million of that cost would be funded from the Excess Net Operating Income. Thus, under Debtor's projections, Gold Coast would receive 80 percent of future appreciation attributable to seismic strengthening.

6. A class accepts a plan if a majority in number and two-thirds in amount of those creditors voting accept the plan. 11 U.S.C. § 1126(c). Assuming Debtor properly fixes Gold Coast's secured claim at $12.0 million, Gold Coast has an unsecured deficiency claim of $6.5 million, representing the difference between the amount of the Note and its $12.0 million secured claim. This is so even though the Note is nonrecourse by its own terms. *See* § 1111(b)(1)(A). Debtor's most recent plan also places in class 7 the additional claims Gold Coast purchased. Thus, Gold Coast controls 100 percent of class 7 claims, and can prevent acceptance by that class.

The court reserved all disputed factual issues for another hearing.

## ANALYSIS

### I

### OBJECTIONS TO CONFIRMATION OF PLAN

#### A. Unsecured Claim of Gold Coast

Class 7, which includes all unsecured creditors other than the Necessary Service Providers, rejects Debtor's plan.[6]

■ A plan of reorganization may be confirmed following rejection by a class of creditors only if the plan is "fair and equitable" with respect to the rejecting class. Section 1129(b)(2) of the Code [7] defines the minimum standards that a plan must meet to be fair and equitable. To be confirmed following rejection by unsecured creditors, the plan must conform to the absolute priority rule: unsecured creditors must be paid in full with interest from the confirmation date forward if the debtor is to retain anything under the plan [8].

Debtor's plan does not conform to the absolute priority rule. The plan does not propose to pay class 7 unsecured creditors in

7. All statutory references are to the United States Bankruptcy Code, Title 11 of the United States Code.

8. Section 1129(b)(2) provides in relevant part:

For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

.    .    .    .    .

(B) With respect to a class of unsecured claims—
(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

full,[9] yet Debtor will retain ownership of the Office Building, the only significant asset of the estate.

■■■ Debtor seeks to confirm its plan under the "new value" exception to the absolute priority rule. The Ninth Circuit has recognized the new value exception. *In re Bonner Mall Partnership*, 2 F.3d 899 (9th Cir.1993), *cert. granted*, —— U.S. ——, 114 S.Ct. 681, 126 L.Ed.2d 648 (1994). Under the new value exception, a debtor may confirm a plan under which it retains property, over the objection of unsecured creditors and without paying those creditors in full, by contributing new capital to the reorganized debtor. The theory of the new value exception is that former equity owners retain property in exchange for the new contribution, and not on account of their prior equity interest. In order to satisfy the new value exception, the capital contribution made by former equity owners must be: (1) new; (2) substantial; (3) in cash or a cash equivalent; (4) necessary for a successful reorganization; and (5) reasonably equivalent to the value or interest received. *Id.* at 908. The new value exception is to be applied with care.

> We recognize that, if applied carelessly, the doctrine has the potential to subvert the interests of creditors and allow debtors and old equity to abuse the reorganization process. The proper answer to these concerns is vigilance on the part of bankruptcy courts in ensuring that all of the requirements of the new value exception are met in every case.

*Id.* at 918. To satisfy the new value exception, Debtor's partners would contribute to capital $1.0 million in cash upon the effective date of the plan.

■■■ The absolute priority rule is only a minimum requirement for confirmation. Compliance with that rule via the new value

exception does not guarantee that a plan is confirmable. Section 1129(b)(2) states: "the condition that a plan be *fair and equitable* with respect to a class *includes the following requirements.*" (Emphasis added.) Thus, the Code plainly provides that a plan may not be fair and equitable, even though it satisfies the absolute priority rule or the new value exception to the absolute priority rule.

> Section 1129(b)(2) sets minimal standards plans must meet. However, it is not to be interpreted as requiring that every plan not prohibited be approved. A court must consider the entire plan in the context of the rights of the creditors under state law and the particular facts and circumstances when determining whether a plan is "fair and equitable."

*In re D & F Const. Inc.*, 865 F.2d 673, 675 (5th Cir.1989). *Accord In re Sandy Ridge Development Corp.*, 881 F.2d 1346, 1352 (5th Cir.1989); *In re IPC Atlanta Ltd. Partnership*, 142 B.R. 547, 555 (Bankr.N.D.Ga.1992); *In re Montgomery Court Apartments*, 141 B.R. 324, 356 (Bankr.S.D.Ohio 1992); *In re MCorp Financial, Inc.*, 137 B.R. 219, 236 (Bankr.S.D.Tex.1992); *In re Outlook/Century Ltd.*, 127 B.R. 650, 656 (Bankr.N.D.Cal. 1991).

■■■ As explained below, Debtor's plan furthers few of the recognized goals of chapter 11 reorganization, and undermines statutory provisions enacted by Congress to discourage "lien stripping" based on court-determined valuation. For this reason, I conclude that the plan is not fair and equitable with respect to class 7 unsecured creditors, irrespective of whether it satisfies the new value exception.

First, Debtor's plan does not further the recognized reorganization goal of preserving equity of the Debtor. Debtor asserts that the Office Building has a fair market value of $8.0 million. Debtor acknowledges that the

---

**9.** Debtor's plan proposes to provide each class 7 creditor: (1) a promissory note equal to 15 percent of the creditor's claim, bearing interest at eight percent *per annum*, payable as a single lump sum ten years after confirmation; and (2) a percentage (to be fixed by the court) of the future

appreciation in the value of the Office Building, payable in a single lump sum ten years after confirmation. Debtor does not offer to prove that those future distributions will have a value, as of the effective date of the plan, equal to the class 7 claims.

balance on the Gold Coast Note is $18.5 million. According to Debtor, the building is thus overencumbered by $10.5 million. Debtor should not be permitted to assert that the building's value is less than Gold Coast's lien for the purpose of permanently depriving Gold Coast of part of its lien and at the same time contend that Debtor retains some valuable interest in the building that this court should protect. Furthermore, the Office Building is not the place in which Debtor conducts a service or manufacturing business, affording the building economic significance beyond its equity and net income. Debtor's sole business is to own the Office Building and collect rent from tenants. In sum, its past investments notwithstanding, Debtor has no genuine, present economic interest in the building to protect.

Second, Debtor's plan does not further the recognized reorganization goals of preserving jobs and going concern value, and preventing the shrinkage of economic activity resulting from the liquidation of a going business. Whether Debtor's plan is confirmed will have little effect on the use of the Office Building.[10] The Office Building will be rented to tenants in the same way it is now, whether Debtor retains the property or it is acquired by a new owner after a foreclosure sale. In either instance, the owner will need to hire a maintenance staff and a building manager. In either instance, the building will provide a place of business for its tenants. In either instance, the building owner and tenants will use goods and services provided by others. Allowing Gold Coast to foreclose will not lead to any overall loss of jobs or decrease in total economic activity.

Third, Debtor's plan does not significantly further the recognized reorganization goal of maximizing distribution to creditors. Debtor's plan promises to pay class 6 unsecured creditors, the so-called Necessary Service Providers, 85 percent of their claims. These claims total approximately $181,196. Debtor's plan proposes to pay in full the claims of classes 3–5, secured by the automobile, the photocopier, and the facsimile machine. This is not an insignificant distribution to those creditors. Debtor's general partners, however, remain liable for the entire amount of these claims. Furthermore, Debtor's disclosure statement indicates that Debtor's general partners have assets sufficient to pay these claims in full.[11] Thus, the only benefit the plan provides to the creditors in classes 3–6 is that it provides that the general partners will pay part of their liability voluntarily.[12]

Fourth, Debtor's plan does not further the recognized reorganization goal of discharging debts of Debtor or its principals. If Gold Coast is permitted to foreclose, neither Debtor nor its general partners will be liable to Gold Coast for any deficiency on the Note. The Note is nonrecourse by its own terms. Section 1111(b)(1)(A) will not convert that obligation to recourse, because the collateral will have been subject to a sale at which Gold

---

10. *See* J. Ayer, *Bankruptcy As An Essentially Contested Concept: The Case of the One–Asset Case*, 44 S.C.L.Rev. 863, 868–70 (1993).

11. Debtor's disclosure statement indicates that Debtor's general partners have a combined net worth of $17.8 million. It is not clear whether that figure attributes any value to the Office Building. It is clear, however, that the stated net worth of the general partners is not based solely on their interest in the Office Building. The disclosure statement indicates that one of the general partners has an interest in another office building in San Francisco, and that this interest has a value of over $5.0 million.

12. It should also be noted that Gold Coast offered to buy at full face value all claims in classes 3–6, except the claim of G.A. Properties, Inc.

Gold Coast stated on the record that it would continue to offer to pay such claims if it is granted relief from stay and forecloses, presumably because it wants to maintain a smooth working relationship with the suppliers of goods and services to the building.

The only creditor Gold Coast did not offer to pay, G.A. Properties, manages the Office Building for Debtor and is related to Debtor. The sole shareholders and officers of G.A. Properties are officers of Debtor's general partners. G.A. Properties claim of $105,524 for unpaid management fees includes $98,000 that is not payable until July 1, 1996. Debtor did not include the G.A. Properties' claim in the estimate of unsecured claims in its disclosure statement.

Coast had the opportunity to credit bid the full amount of its claim. *See In re Woodridge North Apts., Ltd.*, 71 B.R. 189, 191–92 (Bankr.N.D.Cal.1987). Debtor's general partners will be liable for the claims of classes 3–6 whether or not Debtor's plan is confirmed. Confirmation of a plan cannot discharge a non-debtor co-obligor. *See* § 524(e); *In re American Hardwoods, Inc.*, 885 F.2d 621, 625–27 (9th Cir.1989). Nor does Debtor's plan provide for satisfaction of the general partners' obligations from assets of the estate. Debtor has no equity in any assets that can be liquidated to pay unsecured claims. Under Debtor's plan, unsecured creditors will be paid by old equity holders—the same source such claims will be paid from if Debtor's plan is not confirmed and Gold Coast is permitted to foreclose.

Fifth, Debtor's plan has been rejected by the overwhelming majority of claims. Unsecured creditors holding claims totalling approximately $6.5 million have rejected Debtor's plan. Unsecured claims totalling $165,250 have accepted Debtor's plan. Thus, 97.5 percent of all unsecured claims voting have rejected Debtor's plan. In addition, 99.7 percent of all secured claims have voted to reject Debtor's plan. This is not an instance in which a bare 34 percent of the unsecured creditors has prevented confirmation of a plan favored by a majority of creditors.

Sixth, confirmation of Debtor's plan would unduly undermine Congress' determination that a lien should generally not be reduced on the basis of court-determined valuation of the collateral over the objection of the lienholder. Under chapter XII of the Bankruptcy Act of 1898, a single asset real estate limited partnership could confirm a plan over the objection of a nonrecourse secured creditor by paying that creditor only the court-determined value of the collateral, a result generally known as "lien stripping." *See In re Pine Gate Associates*, 2 BCD 1478 (Bankr. N.D.Ga.1976), 3 BCD 813, 3 BCD 838 (Bankr.N.D.Ga.1977). In enacting section 1111(b)(1)(A) of Bankruptcy Code in 1978, Congress intended to overrule the *Pine Gate* decision. 5 Collier on Bankruptcy, ¶¶ 1111.02 at 1111–29 (15th Ed.1994) (hereinafter Collier).

Congress overruled *Pine Gate* for two reasons. First, Congress was concerned that *Pine Gate* imposed the risk of erroneous valuation on the secured creditor. That risk is substantial when the collateral is real property, which unlike publicly traded stocks and bonds, does not have a readily ascertainable market value. *See* Collier at 1111–20 & 21; *Woodridge North Apts., supra*, 71 B.R. at 191–92. Second, Congress wanted to prevent the debtor from retaining the exclusive benefits of future appreciation in the value of the collateral. Collier at 1111–22; *In re California Hancock*, 88 B.R. 226, 231 (9th Cir. BAP 1988); *Woodridge North Apts., supra*, 71 B.R. at 192.

Congress overruled *Pine Gate* by providing a lienholder an unsecured deficiency claim to the extent its claim exceeds the court-determined value of its collateral, except when the collateral is sold and the secured creditor has an opportunity to credit bid the full amount of its claim at the sale. *See* 11 U.S.C. § 1111(b)(1)(A); *California Hancock, supra*, 88 B.R. at 228–31; *Woodridge North Apts., supra*, 71 B.R. at 192–93. If the collateral is not sold and the lienholder believes that the court-determined value of the collateral is too low, the lienholder can generally block confirmation, because its unsecured deficiency claim will generally be at least one-third of any class in which it is included. Collier at 1111–30. If the collateral is sold, the undersecured creditor can override the court-determined valuation by bidding its claim at the sale until it either receives the collateral or the collateral is sold for a price the lienholder believes is appropriate or is sufficient to pay the lien in full. *Woodridge North Apts., supra*, 71 B.R. at 192.

█ The effectiveness of the anti-*Pine Gate* provision depends upon enforcement of the absolute priority rule. Where the plan does not provide for sale of the collateral, a lienholder can prevent its lien from being "stripped" only if it can use its deficiency

claim to block confirmation. The new value exception to the absolute priority rule thus undermines the anti-*Pine Gate* provision and should be applied with extreme caution in cases involving a lien-stripping plan in a single-asset real estate case.

Since the issue relates so often to the single asset real estate case, it is useful to recall exactly what Congress enacted in that particular regard. Through sections 1111(b), 1124, and 1129(b)(2)(A), Congress specifically legislated to prevent the result that occurred under former Chapter XII and the *Pine Gate* line of cases. It did not want the debtor to be able to retain the property subject to the mortgage by paying an appraised value that was considered to be the secured portion of it, over the objection of the secured creditor. If the so called new value exception is applied, in effect, the debtor can accomplish the same result by ignoring the unsecured deficiency which the mortgagee has a right to under section 1111(b) that makes all loans recourse loans.

The use of section 1111(b) means that … the mortgagee … has two claims, one secured and the other unsecured. In these instances, the odds are great that the unsecured deficiency is large enough to control the whole unsecured creditor class and to reject the plan. What Congress has then said in section 1129(b) is that the plan can only be confirmed by a cram down, and then only if the unsecured creditor class is paid in full or equity (the junior class) receives nothing under the plan. A new value exception would obviate these results which Congress so carefully constructed.

Collier 1111–29 & 30.

Debtor's plan does not fulfill a reorganization purpose merely because Debtor asserts that the Office Building requires seismic strengthening and that its plan will provide such strengthening. This court should assume that any purchaser at a foreclosure sale will maintain the Office Building consistent with all statutory and common law duties of care. There is no evidence that Gold Coast is a building code scofflaw that purchases buildings and declines to maintain them properly.

Whether Debtor's plan should be confirmed is also not affected by the fact that Gold Coast purchased the Note at a substantial discount. The purchaser of a claim is entitled to enforce all rights under the claim, irrespective of the price paid for the claim. *In re Marin Town Center*, 142 B.R. 374 (N.D.Cal.1992).

The inequities in Debtor's plan are not overcome by the fact that the plan offers Gold Coast a share in future appreciation of the Office Building. Because the plan serves few, if any, of the recognized goals of reorganization, Gold Coast should not be required to enter into an involuntary partnership with Debtor on the basis of a bankruptcy court's determination that Gold Coast is being offered fair terms. The core concept of the anti-*Pine Gate* provisions is that the lienholders' choice overcomes the court's determination of what constitutes fair treatment.

Upon consideration of the undisputed facts and circumstances of this case, I determine that Debtor's plan should not be confirmed. Debtor has no equity in the Office Building to preserve. Debtor's plan does not preserve jobs or going concern value. Debtor's plan would not provide any meaningful discharge for Debtor or its principals. Debtor's plan has been rejected by creditors holding 97.5 percent of unsecured claims and by creditors holding 99.7 percent of secured claims. The benefits offered accepting creditors are trivial in the context of the total claims in the case. Confirmation of Debtor's plan would substantially undermine the anti-*Pine Gate* provisions of the Code. The principal effect of the plan would be to afford Debtor's equity holders an opportunity to make a new investment with an unwilling partner. In light of all these considerations, I determine that Debtor's plan is not fair and equitable with respect to class 7 unsecured creditors, even if the plan does satisfy the requirements of the new value exception to the

absolute priority rule.[13]

## B.  Other Confirmation Issues

In light of my conclusion that Debtor's plan is not fair and equitable with respect to class 7 unsecured creditors, I need not rule upon the other confirmation issues raised by Gold Coast: whether the plan properly treats Gold Coast's secured claim; whether the separate classification of the unsecured claims of Necessary Service Providers is appropriate; and whether the eve-of-filing claims incurred in purchasing the automobile, photocopier, and facsimile machine should be disregarded in determining whether there is an impaired assenting class under section 1129(a)(10).[14]

## II

## Relief from the Automatic Stay

This court must grant relief from the automatic stay to allow Gold Coast to foreclose on the Office Building if Debtor has no equity in the building and the property is not necessary for an effective reorganization. *See* 11 U.S.C. § 362(d)(2).  Debtor acknowledges it has no equity in the building.  Property is necessary for an effective reorganization only if the debtor is able to confirm a plan within a reasonable period of time. *United Savings Ass'n v. Timbers of Inwood Forest*, 484 U.S. 365, 375–76, 108 S.Ct. 626, 632–33, 98 L.Ed.2d 740 (1988).  Thus, where a debtor lacks equity in a property, it is appropriate to grant relief from stay if the moving creditor can block confirmation of any plan of reorganization. *In re Winters*, 99 B.R. 658, 664 (Bankr.W.D.Pa.1989); *Woodridge North Apts., supra*, 71 B.R. at 190.  Because the court has now denied confirmation of two different plans submitted by Debtor, and because it is unlikely Debtor could propose a confirmable plan if afforded additional time [15], I determine that Debtor has had a reasonable opportunity to confirm a plan and that relief from stay should now be granted.

## CONCLUSION

Confirmation of Debtor's Third Amended Plan of Reorganization is denied.  Gold Coast is granted relief from the automatic stay to exercise any and all of its rights against the Office Building and any other collateral securing the Note.

**13.** For similar reasons, the Debtor's plan may also fail to satisfy the new value exception.  The new value exception requires that the new capital contribution be "necessary to a successful reorganization." *See Bonner Mall, supra*, 2 F.3d at 908.  In light of the fact that Debtor's plan fulfills few, if any, recognized goals of reorganization, one could easily conclude that confirmation of the plan would not constitute a *successful* reorganization.

**14.** I am also inclined not to rely on Gold Coast's argument that Debtor is guilty of "class gerrymandering" and "artificial impairment," because I believe courts often use improper classification as a rationale to deny confirmation in single-asset real estate cases where the court's real concerns are similar to those I have relied upon in holding that Debtor's plan is not fair and equitable in an overall sense.  The result of some of those decisions is the creation of classification rules stricter than the language of the Code requires and that may be inappropriate outside the context of a single-asset real estate case. *See* J. Krause, *The Bias of the Courts Against Single-Asset Real Estate Cases in Creating Bad Law in the Area of Classification*, 22 Cal.Bankr.J., No. 1 at 47 (1994).

**15.** Under the principles set forth in this decision, Debtor could confirm a plan over the objection of Gold Coast only by paying Gold Coast's claims in full or by putting the Office Building up for sale in a liquidating plan.  Debtor has given no indication that it is willing and able to pay the Gold Coast claims in full.  A liquidating plan would not prevent Gold Coast from obtaining the Office Building, because Gold Coast should be able to credit bid the full amount of its claim at any sale under the plan. *California Hancock, supra*, 88 B.R. at 228–31.