**In re MIDWAY INVESTMENTS, LTD., a Florida limited partnership, Debtor.**

**Bankruptcy No. 95–20241–BKC–RBR.**

United States Bankruptcy Court,
S.D. Florida,
Broward Division.

July 6, 1995.

Peter H. Levitt, Miami, FL.

Robert L. Jennings, Ft. Lauderdale, FL, for debtor.

John A. Moffa, Tampa, FL.

Arthur C. Neiwirth, Ft. Lauderdale, FL.

Joel L. Aresty, Gary J. Rotella, Miami, FL.

Arthur H. Rice, Miami, FL.

### MEMORANDUM DECISION AND ORDER DISMISSING CASE FOR BAD FAITH FILING

RAYMOND B. RAY, Bankruptcy Judge.

This matter came before the Court on May 10 and 15, 1995 upon a Motion for Dismissal for Bad Faith Filing ("Motion for Dismissal") filed by Aetna Casualty and Surety Company ("Aetna")[1].

---

**1.** The Court previously granted Aetna's Motion for Relief from Automatic Stay, but retained jurisdiction over this case pending completion of a full evidentiary hearing on Aetna's Motion for Dismissal.

Upon consideration of the evidence adduced at the hearing, the motion, briefs and other documentation submitted by the parties, the testimony of witnesses, the Court file, and applicable authorities, I make the following findings of fact and conclusions of law.

### FINDINGS OF FACT

The Debtor, Midway Investments, Ltd. ("Midway"), owns a shopping center in Tamarac, Florida. Since 1988, Aetna has held a first mortgage on the center and an assignment of all rents and profits, securing an original principal balance of $18.8 million.

Midway failed to make several payments of principal and interest due in 1992. In lieu of foreclosure, Aetna and Midway entered into a cash flow agreement whereby Aetna agreed not to pursue its remedies and Midway agreed to remit to Aetna all net operating income ("NOI") from the center.

The note matured on July 1, 1993, and Aetna agreed to extend the "termination date" of the cash flow agreement to October, 1993.

In December, 1993, Aetna and Midway entered into a series of agreements. The termination date of the cash flow agreement was extended again, to March 31, 1994, and the interest rate on the loan was reduced. Aetna and Midway also entered into a discounted payoff agreement, whereby Aetna agreed to accept a reduction of over $4 million in principal and $2 million in interest[2] if the loan was repaid before the March 31, 1994 termination date, time being of the essence. The discounted payoff agreement required Midway to make an initial payment of $250,000, which it did, and permitted Midway to extend the termination date to December 31, 1994 by making an additional payment of $750,000 by March 31, 1994.

As part of these agreements, Midway placed in escrow a deed to the entire project[3]. Aetna was entitled to the deed if the discounted payoff was not made by the ter-

mination date, or earlier if Midway committed a "termination event", i.e., a breach of its agreements. The escrow agent was to deliver the deed within 10 business days after Aetna's request unless Midway procured an injunction from a court of competent jurisdiction or furnished the escrow agent with a "dispute notice" stating under oath that the loan had been repaid or that the termination date or the termination event, as applicable, had not occurred.

Midway was unable to make the $750,000 payment by March 31, 1994, and requested additional time from Aetna. The parties then entered into an "extension agreement" giving Midway until May 30, 1994 to make the payment. The extension agreement provided that, since December 31, 1994 was a Saturday, the termination date would be December 30, 1994. The extension agreement further provided if the loan were not repaid by December 30th, Aetna would be entitled to receive the deed immediately, without regard to the 10 business day period contemplated by the escrow agreement. The extension agreement also provided that Midway's failure to give written notice by December 9 that it "has, or reasonably expects to have (based on arrangements then in process) . . . the ability, resources and wherewithal" to pay off the loan by December 30 would constitute an additional "termination event".

In connection with the extension agreement, the parties also executed a loan modification agreement reducing the interest rate from 9.875% to 6.875% and providing that the interest of $2,014,991.96 which had accrued as of March 31, 1994 (and which would have been forgiven if the loan were repaid by December 30) would be payable without interest if the loan was not repaid by December 30, 1994. The loan modification agreement modified the cash flow agreement as well, imposing a requirement that Aetna approve disbursements for capital improvements, tenant improvements and leasing commissions.

---

2. The balance of the loan was stipulated to be $17,931,811.79 plus interest. Aetna agreed to accept $13,709,000 in satisfaction of the loan. Interest was later stipulated to be $2,014,991.96 as of March 31, 1994.

3. The deed was accompanied by a bill of sale, no lien affidavit and other documents, collectively referred to herein as the "deed".

Midway waived its right to the benefits of the automatic stay relief provided by 11 U.S.C. § 362 in both the discounted payoff agreement and the loan modification agreement, and agreed that those documents were in lieu of and rendered any bankruptcy unnecessary. This Court entered its order granting Aetna stay relief on March 31, 1995.

Midway stopped paying NOI after June 1, 1994. Alan Goldberg, president of Midway's general partner, testified that Midway stopped payments due to Aetna's refusal to release some $39,000 of tenant improvement expenses. William Chamberland testified for Aetna that he declined to release the funds since Midway failed to provide the budget or backup documentation required by the loan documents. I find that Midway was not justified in withholding payments of NOI in excess of the amount in dispute.

Although the failure to pay NOI constituted a "termination event", Aetna continued to forbear from exercising its remedies.

Midway's schedules filed in this case indicate that Midway made distributions of approximately $450,000 to its partners from May, 1994 through the filing of its petition, some of which were claimed to be in lieu of leasing commissions and management fees. Goldberg testified that these distributions were income consolidations consistent with Midway's new REIT structure, and that Aetna was aware of the distributions. Chamberland testified that he was aware of the REIT structure, but was never apprised of the distributions and never gave consent. The loan modification agreement and cash flow agreement required Aetna's approval to such payments. I find that Aetna did not consent or acquiesce to the distributions.

On December 9, 1994, Midway notified Aetna that it "has, or reasonably expects to have … the ability, resources and wherewithal" to pay off the loan by December 30. On December 14, Midway notified Aetna that it was pursuing funding of the payoff but was unable to "finalize a commitment", and requested a 5 year extension of the loan. Aetna rejected the request on December 16, stating it expected the loan to be paid by December 30.

On December 19, Midway requested an extension to January 31, 1995, with the right to a further extension upon payment of $100,-000.00 by that date. On December 21, Midway requested an extension for an additional 2 years. On December 23, Midway made a further extension proposal.

Aetna, in response to the Debtor's various proposals, verbally offered to extend the loan for 6 months past the December 30th date in consideration for a $1 million payment by December 30th and an $800,000.00 increase in the payoff amount. On December 28, Aetna wrote to Midway confirming its verbal offer and rejecting Midway's pending requests. Aetna further advised of its intention to request delivery of the deed if Aetna's proposal was not accepted by December 30, 1994.

On December 30, the "termination date", Midway wrote to Aetna to confirm a December 29 conversation in which Midway proposed a 90 day extension. The letter advised Aetna that Midway was negotiating a tax free exchange of the center with Kimco, and enclosed a letter from Kimco's president stating that Kimco was prepared to enter into such an agreement. The Kimco letter did not set forth any details of the transaction. Aetna advised Midway in late afternoon of December 30 that Aetna rejected Midway's request for the proposed 90 day extension.

Midway did not make the discounted payoff by December 30 and did not accept Aetna's proposal for a 6 month extension. On December 31, Aetna, stating that the termination date had occurred, requested that the escrow agent deliver the deed. Although the extension agreement eliminated the 10 business day waiting period, the escrow agent waited the 10 business days.

Meanwhile, as January 13, 1995 (the 10th business day after December 31) approached, Midway continued to urge Aetna to accept the Kimco deal or to extend the loan for 5 years. Aetna requested details of the Kimco deal and Midway advised Aetna that the deal would yield Aetna only $11,565,000. Midway's last proposal came on January 16, 1995. On January 17 Aetna rejected all of Midway's proposals.

On January 18, Midway sent a notice to the escrow agent, disputing that a "termination event" had occurred and directing the escrow agent not to deliver the deed. The escrow agent had not delivered the deed to Aetna by January 23, the date Midway filed its Chapter 11 petition, and later stated in papers filed in an adversary case before this Court that it held the deed as a result of Midway's notice. Goldberg testified that between January 18 and January 23, 1995, he did not know whether the escrow agent would deliver the deed.

In addition to its first mortgage, Aetna held a perfected lien on all rents from the center. On January 19, 1995 it invoked its rights under Section 697.07 of the Florida Statutes to require that all rents in Midway's possession or subsequently collected be turned over to Aetna. Shortly after the commencement of this case, Midway offered Aetna adequate protection payments of $50,000.00 per month, which were substantially less than Midway's post-petition NOI. Aetna did not accept that amount and moved this Court to prohibit or condition the use of its cash collateral. The Court's stay relief order permits Aetna to enforce its assignment of rents in state court, without prejudice to its right to return to this Court should the state court not grant suitable relief.

Despite Aetna's opposition to Midway's use of rents, and without Court approval, Midway continued to use post-petition rents to fund operating expenses, construction costs, leasing commissions, management fees and professional fees. Midway's filings show $370,545.22 of post-petition net operating income through March 31, 1995. Midway's Plan of Reorganization filed on May 2, 1995 would apply up to $300,000.00 of these funds and additional rents collected to the payment of disputed unsecured creditors (Class 5), with the remainder to fund tenant security deposits (Class 3) or litigation of claims of disputed unsecured creditors (including the unsecured portion of Aetna's claim).

William Chamberland testified that Midway's indebtedness to Aetna as of January 18, 1995 was $18,949,846.17.[4] Aside from Midway's belief that the debt should remain at $12.7 million, this figure was not controverted. I find that the amount of the debt as of the petition date was not $12.7 million, but $18,949,846.17.[5]

Based on the testimony of Aetna's appraiser, the I find the fair market value of the center as of the petition date to be $14.3 million. Midway's appraiser did not perform a complete appraisal but suggested a value $500,000.00 to $750,000.00 lower, claiming Aetna's appraiser underestimated the potential impact of the closing of Frank's Nursery, a major tenant. I find that Aetna's appraiser made realistic, market-based projections concerning the lease-up period and rental market rate for the Frank's Nursery space.

The shopping center (together with its related claims and rights) constitutes Midway's sole asset.[6] Midway's schedules show $1,398,102.22 in unsecured, non-priority claims. Of this, $850,000.00 is an insider claim, a loan from Midway's general partner. An additional $35,000.00 is owed to PSI Realty Services, Inc., Midway's affiliated property management company.

Most of the remaining non-priority unsecured debt is owed to tenants, either for security deposits or tenant improvement allowances. Goldberg and Gene Newman, the property manager, testified that tenants have been setting off these debts against their rents. Midway has not segregated the security deposits, but these claims are contingent

4. This indebtedness consisted of: (1) principal, $16,931,811.79; (2) interest from 12/1/94–1/18/95 @ 6.875%, $158,441.78; (3) default interest from 1/1/95–1/18/95 @ 6%, $50,795.44; and (4) premodification interest, $2,014,991.96, less (5) TI and tax reserve, $206,194.80.

5. Aetna's testimony was as of January 18, 5 days before the petition date; the Court has accepted this figure even though the total might have included 5 days' additional interest.

6. Midway's schedules reflect personal property valued at $1,307,394.26. This consists primarily of tenant inducement costs, prepaid lease commissions and capitalized construction costs. Whether these are realty or personalty, they are inextricably intertwined with the center. Midway's Plan describes "Accumulated Rental Income" and "Recovery Proceeds" from landlord-tenant litigation as additional assets. These are rents and proceeds of the center, subject to Aetna's assignment of rents and part of Aetna's cash collateral.

and will not be due (if at all) until the expiration of the leases.

The remaining unsecured non-priority claims are few and small in comparison to the total. Two professional firms, Holland & Knight and Kenneth Leventhal & Company, are owed $25,000.00 each; the remainder total under $65,000.00.[7]

Real estate taxes consist of approximately $400,000.00.

Midway has no employees. It is managed by an affiliated management company. Aside from its disputes with Aetna, it has no litigation with creditors. Goldberg testified that Midway commenced this case to resolve the claims of various creditors and reorganize its debts. Upon questioning by the Court, however, Goldberg admitted that Midway's dispute with Aetna was the principal reason for the filing.

Midway's proposed Chapter 11 Plan is based on the proposed tax free exchange by Midway's general partner of its general partnership interest in Midway for a partnership interest in a partnership to be formed by a subsidiary of Regency Realty Corporation. Midway is not a party to the agreement with Regency but has moved for approval of the agreement. The Regency agreement provides that Midway will continue to own and operate the center following a court approved sale free and clear of liens pursuant to Section 363(f).

The Plan (p.9) would give Aetna $12.7 million in full satisfaction of its secured claim. Even if Aetna were to receive the entire $300,000.00 fund for disputed unsecured claims on its unsecured claim, it would only receive $13 million on its claim of nearly $19 million.

The Regency agreement contains a base price with an opportunity for Midway's general partner to receive additional partnership units under certain circumstances. While the potential for such additional receipts may exist, I find that the possibility of such receipts is contingent and cannot be considered to cure the Plan's inherent problems.

### CONCLUSIONS OF LAW

Aetna asserts that this case is essentially a two party dispute and a "bad faith" bankruptcy filing which should be dismissed on those grounds. "Dismissal of a Chapter 11 bankruptcy case for bad-faith filing is a power that should be exercised with extreme caution. Ordinarily, to justify such a dismissal, there should exist circumstances other than alleged hopeless financial condition of a debtor. Otherwise, Chapter 11 will likely become a protection and remedy easily available to those who need it the least, while those who need it the most will be left to essentially prove good faith in order to qualify." *In re Mill Place Limited Partnership*, 94 B.R. 139, 140 (Bankr.D.Minn.1988).

Although there is no fixed test for determining whether a petition is filed in bad faith, the Eleventh Circuit has set forth a non-exhaustive list of factors which a court may consider in deciding whether to dismiss a debtor's case as a bad faith filing, including:

(1) the debtor has only a single asset ... in which it does not hold legal title;

(2) the debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditor;

(3) the debtor has few employees;

(4) the property is the subject of a foreclosure action as a result of arrearages on the debt;

(5) the debtor's financial problems essentially involve a dispute between the debtor and the secured creditor which can be resolved in the pending state court action; and

(6) the timing of the filing evidences an intent to delay or frustrate the legitimate

---

7. Peter Casoria, Jr. has filed a proof of claim as an unsecured non-priority creditor in the amount of $750,000.00 to which Aetna has objected. The hearing upon Aetna's objection to the Casoria claim has been continued to August 22, 1995 at 1:30 p.m. Casoria is not shown as a creditor in Midway's schedules. Casoria testified that he loaned that amount to Midway's general partner, which *is* shown as a creditor. Casoria testified that Midway did not execute any note, guaranty or other document obligating itself to him. As such, and without making any finding as to the validity, extent or priority of the Casoria claim, the claim has not been included in this analysis.

efforts of the secured creditor to enforce its rights.

*In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393, 1394–1395 (11th Cir.1988), citing *In re Little Creek Dev. Co.,* 779 F.2d 1068, 1073 (5th Cir.1986) and *In re Natural Land Corp.,* 825 F.2d 296, 298 (11th Cir.1988).

In *In re Albany Partners,* 749 F.2d 670, 674 (11th Cir.1984), the Court stated the inquiry more generally:

> In finding a lack of good faith, courts have emphasized an intent to abuse the judicial process and the purposes of the reorganization provisions. Particularly when there is no realistic possibility of an effective reorganization and it is evident that the debtor seeks merely to delay or frustrate legitimate efforts of secured creditors to enforce their rights, dismissal of the petition for lack of good faith is appropriate.

The shopping center is Midway's sole asset. The personal property shown in the Debtor's schedules and the accumulated rental income and "recovery proceeds" (defined as funds that may be recovered from pending litigations against two tenants) described in its Plan are part and parcel of the shopping center. Further, by virtue of the underlying loan documents, all such property may secure Aetna's loan.

Prior to undertaking the foregoing factor analysis, I have considered whether the 1994 amendments to the Bankruptcy Code affects existing case law in single asset cases[8]. I have concluded that the Bankruptcy Reform Act of 1994 ["Reform Act"] does not limit the *Phoenix Piccadilly* line of cases. Rather, the Reform Act grants additional rights to creditors in single asset case by amending § 362 to provide that courts, upon request, *shall* grant relief with respect to the stay of actions in single asset real estate cases unless not later than the date after the entry of an Order for Relief (or such later date as the court may determine for cause by order entered within that 90 day period):

> (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or
>
> (B) the debtor has commenced monthly payments to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien), which payments are in an amount equal to interest at a current fair market rate of the value of the creditor's interest in the real estate.

11 U.S.C. sec. 362(d)(3).

The Act also redefined single asset real estate to mean:

> real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto, having aggregate secured debts in an amount no more than $4,000,000.00.

11 U.S.C. sec. 101(51 B).

The Reform Act in effect "amends the automatic stay provision under which creditors of a single asset real estate debtor may have the stay lifted if the debtor has not filed a 'feasible' reorganization plan within 90 days of filing, or has not commenced monthly payments to secured creditors." (*2 Collier on Bankruptcy,* sec. 362.07 (Lawrence P. King ed., 15th ed. 1995)).

Section 218 of the Act, creating new Sections 101(51B) and 362(d)(3), therefore essentially operates as a limit on the automatic stay. This limitation tends to favor creditors; particularly the secured creditor with the largest interest in the single asset real estate. Support for this assertion is reflected in Senator Brooks' (D–Tx) statement that creditors should find "comfort" in their "new rights" under the Act and because there are a number of provisions designed to

---

8. The Court is conscious of the fact that the amendments within the Reform Act relating to single asset real estate cases are limited to cases in which the aggregate noncontingent liquidated secured debts do not exceed $4,000,000.00 and, as such are inapplicable herein. Nonetheless, an analysis of the effect of the Reform Act upon existing case law will be made to establish the continued applicability of the *Phoenix Piccadilly* line of cases in this Circuit.

curtail bankruptcy fraud and abuse and reduce the "unnecessary costs and delay of the bankruptcy process." 140 Cong.Rec. H 10,-771 (daily ed. October 4, 1994).

This stated purpose is consistent with the spirit of *Phoenix Piccadilly* and its progeny. Arguably, *Phoenix Piccadilly* stands for the proposition that for a single asset debtor to enjoy protection under the automatic stay, the debtor must have clean hands. That is, the debtor must have filed the petition in good faith.

· The concept of good faith, although not expressly stated in the Bankruptcy code, is "well established" as "a threshold prerequisite to securing chapter 11 relief. Otherwise, if good faith is lacking, there exists a 'cause' sufficient for dismissal under 11 U.S.C. sec. 1112(b)." *In re McCormick Road Associates*, 127 B.R. 410, 412 (N.D.Ill.1991) citing *In re Madison Hotel Associates*, 749 F.2d 410, 426 (7th Cir.1984).

As detailed in the Court's findings set forth above, Midway's unsecured debt to non-insiders is nominal in relation to Aetna's claim. As to the number of employees, Midway has no direct employees. As in *Phoenix Piccadilly*, the property is managed by an affiliated management company.

Moreover, this is plainly a two party dispute. It is clear that Aetna's request for the delivery of the deed (and Midway's risk of imminent loss of its only asset) was the dominant factor that precipitated Midway's filing, and forced the timing of the filing. As heretofore stated, stay relief has been granted and Aetna and Midway are currently litigating their disputes in state court. Midway faced no imminent threats from other creditors. Its only other pending disputes involve claims brought by Midway against two tenants.

As in *Phoenix Piccadilly*, the timing of Midway's filing evidences an intent to delay or frustrate the legitimate efforts of Aetna to enforce its rights. The evidence establishes that Midway made repeated requests for an extension of the December 30, 1994 deadline for payment of the loan at the discounted payoff amount, and that those requests were rejected by Aetna, which had the legal right to do so. Aetna's intentions to adhere to the December 30 deadline and to seek the delivery of the deed were clearly communicated.

Although no foreclosure action was pending, Aetna's demand for the deed posed an even more immediate threat than foreclosure. Delivery of the deed would have divested Midway of its only asset much sooner than a foreclosure, making reorganization impossible (aside from its other obvious implications).

In order to prevent the escrow agent from delivering the deed, Midway sent a notice disputing the occurrence of a "termination event" and directing the escrow agent not to deliver the deed. The evidence establishes that Aetna's demand for the deed was based on Midway's nonpayment of the loan by the December 30 "termination date", and that Midway did not and could not have disputed that fact. Midway's notice to the escrow agent was not responsive to the requirements of the escrow agreement. Such non-responsiveness was deliberate and the notice was sent to frustrate Aetna's attempt to enforce its right under the escrow agreement to take title to the center as it was entitled. I therefore find that Midway's efforts to impede the delivery of the deed were undertaken in bad faith, solely to forestall Aetna's enforcement of its remedies. *Phoenix Piccadilly*, 849 F.2d at 1395; *Albany Partners*, 749 F.2d at 674.

It is undisputed that Midway lacks equity in its property. The fair market value of the center on the petition date was $14.3 million, and the debt to Aetna was $19 million. Midway's appraiser believed the value was even less. The Regency agreement would initially yield no more than $13.65 million, less substantial closing costs, assuming no adjustments.

Midway's distributions of approximately $450,000.00 to partners in the 7 months preceding the filing violated the cash flow agreement and loan modification agreement and provides the most salient evidence of bad faith. These distributions continued at a time when Midway knew or should have known it would be unable to pay off the loan on December 30, 1994. Midway distributed approximately $100,000 after December 30

while it was clearly unable to pay the Aetna loan. At least to the extent these distributions exceed the $39,000.00 in tenant improvement costs that Midway asserts Aetna wrongfully declined to release, they provide further evidence of bad faith for purposes of this dismissal.

■ The finding of bad faith precludes the possibility of a successful reorganization in essence because the proceedings have been tainted from the start. "[T]he prospects of a successful reorganization do not override, as a matter of law, the finding of bad faith." *Phoenix Piccadilly*, 849 F.2d at 1394. Citing its earlier decision in *In re Natural Land*, the court stated:

> The taint of a petition filed in bad faith must naturally extend to any subsequent reorganization proposal; thus, any proposal submitted by a debtor who filed his petition in bad faith would fail to meet section 1129's good faith requirement. 849 F.2d at 1395, *citing*, 825 F.2d at 298.

■ Nonetheless, an analysis of Midway's Plan of Reorganization supports the conclusion that reorganization is unlikely. The Plan treats the Regency agreement as a Section 363(f) sale, although the agreement is structured as an exchange by Midway's general partner of its partnership interest in Midway for an interest in a partnership formed by Regency, with Midway remaining the owner of the center.[9] Sale under Section 363(f) would be inappropriate in such case.

Midway urges that the exchange is equivalent to a sale. Even if it were, the Court is aware that Aetna is likely to oppose the Plan and has therefore considered whether Mid-

way can confirm the Plan without Aetna's consent.

■ The Plan would bifurcate Aetna's claim into secured and unsecured claims. Aetna would receive $12.7 million on its secured claim. A $300,000 fund would be established to fund disputed unsecured claims and to pay the claims, pro rata, to the extent allowed. Aetna would receive its pro rata share of this fund on its $6.3 million unsecured claim. The Plan makes no provision for Aetna to realize on the rents constituting part of its cash collateral. The Plan makes no provision for Aetna to credit bid or make a Section 1111(b) election. The Plan requires Aetna to release its liens and prohibits the exercise of its contractual remedies. I find that Aetna's secured and unsecured claims would be impaired. Assuming that Aetna does not consent to the Plan, the Plan can only be confirmed if the Court finds that under Section 1129(b)(1) that it does not discriminate unfairly, and is fair and equitable with respect to Aetna's claims.

■ I do not find that the Debtor's proposed Plan is fair and equitable with respect to Aetna's claims under the standards of Section 1129(b)(2). The Plan fails under Section 1129(b)(2)(A)(i) with respect to Aetna's secured claim since Aetna would not retain its lien and would not receive either the value of the center ($14.3 million) or the amount of its claim (approximately $19 million). Alternatively, the Debtor's proposed Plan fails under Section 1129(b)(2)(A)(ii) since the sale is not a sale of property of the estate [10] and does not afford Aetna the right to credit bid the entire amount of its claim [11]. The right to credit bid the full amount of a secured

---

9. Section 2.3 of the Regency agreement provides that Regency may, at its option, acquire title to the center. However, it is evident that primary purpose of the Regency agreement is to effectuate the tax free exchange of partnership interests.

10. A partner's interest in a partnership debtor is not "property of the estate" as defined in Sections 363(b) and 541. *See In re Funneman*, 155 B.R. 197, 200 (Bankr.S.D.Ill.1993); *In re Notchcliff Assoc.*, 139 B.R. 361 (Bankr.D.Md.1992); *In re Jones*, 121 B.R. 122 (Bankr.M.D.Fla.1990).

11. *John Hancock Mutual Life Ins. Co. v. California Hancock, Inc.*, 88 B.R. 226, 228 (Bankr. 9th

Cir.1988); *In re Kent Terminal Corp.*, 166 B.R. 555, 567 (Bankr.S.D.N.Y.1994); *In re Monarch Beach Venture, Ltd.*, 166 B.R. 428, 433 (Bankr. C.D.Cal.1993). *See also In re H & M Parmely Farms v. Farmers Home Admin.*, 127 B.R. 644, 648 (Bankr.D.S.D.1990); *In re 222 Liberty Assocs.*, 108 B.R. 971, 979 (Bankr.E.D.Pa.1990); *In re Realty Invs., Ltd. V*, 72 B.R. 143, 146 (Bankr. C.D.Cal.1987); *In re Woodridge N. Apts., Ltd.*, 71 B.R. 189, 191–92 (Bankr.N.D.Cal.1987); *In re Yagow*, 60 B.R. 543, 547 (Bankr.D.N.D.1986), *aff'd*, 860 F.2d 1086 (8th Cir.1988), *cert. denied*, 489 U.S. 1068, 109 S.Ct. 1346, 103 L.Ed.2d 815 (1989).

claim is essential to the protection of a non-recourse secured creditor. Section 1111(b)(1)(A) provides that such a claim must be allowed or disallowed as if it were a recourse claim unless the secured creditor elects treatment under Section 1111(b)(2) (i.e., to have the entire claim treated as secured) or the property is to be sold under Section 363 or under a plan[12]. In order to protect the non-recourse secured creditor when property is sold under Section 363 or under a plan, Section 363(k) provides the right to credit bid the full amount of the claim.[13]

■ The Plan fails under the third alternative, Section 1129(b)(2)(A)(iii), since Aetna would not realize the indubitable equivalent of its secured claim and since the Plan violates the absolute priority rule. The $12.7 million Aetna would receive is less than the fair market value of the center. And although Aetna would receive less than the full amount of its secured claim, the Plan would give unsecured creditors and Midway's general partner convertible partnership units in the acquiring partnership.[14]

■ With respect to Aetna's unsecured claim, the Plan fails to meet the requirements of Section 1129(b)(2)(B). Under clause (i), it fails to give Aetna property of a value equal to its unsecured claim. Under clause (ii), it violates the absolute priority rule, since it would repay the $850,000 unsecured claim of Midway's general partner, satisfy tenants' security deposits and give convertible partnership interests to Midway's general partner, while drastically impairing Aetna's unsecured claim.[15]

■ The Plan is also non-confirmable since Midway would pay junior creditors with Aetna's cash collateral as defined in Section 363(a). I find that Aetna holds a duly perfected lien on pre-petition and post-petition rents from the center, and that Aetna effectively invoked its right to receive the rents under Section 697.07 of the Florida Statutes. Aetna is entitled to adequate protection of its cash collateral under Section 363(e). The Plan fails to meet any of the requirements of Section 361 and would be non-confirmable on this basis alone.

■ Further, the Plan is non-confirmable since it presupposes the Court's approval of the proposed tax free exchange prior to confirmation. The tax free exchange is the reorganization; the Plan is merely the

---

**12.** A "sale of property under section 363 or under a plan is excluded from treatment under section 1111(b) because of the secured party's right to bid in the full amount of its allowed claim at any sale of collateral under section 363(k) of the House Amendment." 124 Cong. Rec. 32407 (Sept. 28, 1978) (statement of Rep. Edwards), reprinted in 1978 U.S.C.C.A.N. 6474. "[A] secured creditor may bid in the full amount of the creditor's allowed claim, including the secured portion and any unsecured portion thereof." 124 Cong.Rec. 32396 (Sept. 28, 1978) (statement of Rep. Edwards) reprinted in 1978 U.S.C.C.A.N. 6446.

**13.** Both section 363(k) and section 1111(b)(2) protect the non-recourse secured creditor from the result in *In re Pine Gate Assoc., Ltd.*, 2 B.C.D. (CRR) 1478 (Bankr.N.D.Ga.1976), in which the court approved a plan which permitted the debtor to discharge the liens of non-recourse, undersecured creditors and, at the same time, retain the unencumbered collateral by paying the creditors the present fair market value of the property subject to the liens, an amount substantially less than the debts secured by the liens. The *Pine Gate* decision was criticized on the ground that it allowed the debtor to have the exclusive benefit of any future appreciation of the collateral and imposed on the secured creditor the entire risk of undervaluation. *See In re 222 Liberty Associates*, 108 B.R. 971, 979 n. 6 (Bankr. E.D.Pa.1990); *In re Woodridge North Apts., Ltd.*, 71 B.R. 189, 191–92 (Bankr.N.D.Cal.1987). In enacting 11 U.S.C. § 1111(b)(1)(A), Congress intended to legislatively overrule *Pine Gate*. 5 Collier on Bankruptcy ¶¶ 1111.02 at 1111–29 (15th Ed.1994); *see also In re Dollar Assoc.*, 172 B.R. 945, 951 (Bankr.N.D.Cal.1994).

**14.** Midway's general partner's services in supervising the management of the property would not satisfy the "new value" exception to the absolute priority rule. *See In re Bonner Mall Partnership*, 2 F.3d 899, 908 (9th Cir.1993), *cert. granted*, 510 U.S. ——, 114 S.Ct. 681, 126 L.Ed.2d 648, *dismissed*, —— U.S. ——, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994).

**15.** Midway's Schedule F shows that SunREIT Properties, Ltd. has an $850,000 unsecured claim. Midway's disclosure statement (p.17) states that SunREIT Properties, Ltd. and 2 other creditors have voluntarily subordinated their claims. However, the total of the subordinated claims is $165,000, which cannot include the $850,000 claim. The Court assumes the $850,000 claim has not been voluntarily subordinated.

scheme for classifying creditors and distributing the proceeds of the tax free exchange. A disposition of all or substantially all of the assets of a debtor must be effected through the voting, disclosure and confirmation requirements of Chapter 11. *In re Braniff Airways, Inc.,* 700 F.2d 935 (5th Cir.1993); *In re White Motor Credit Corp.,* 14 B.R. 584 (Bankr.N.D.Ohio 1981).

 Midway has also misclassified Aetna's unsecured claim in violation of Section 1122(a). Midway has segregated Aetna's unsecured claim of approximately $6.3 million, which it disputes, from undisputed unsecured claims. Midway does not disclose whether any other unsecured claims have been classified as disputed, and it is possible that Aetna will be the sole member of its class. The discrimination against disputed claims was specifically disapproved in *In re ARN., Limited Partnership,* 140 B.R. 5 (Bankr.D.D.C.1992). The court concluded that the legal status of the claim, not its disputed or undisputed status, was the proper focus of classification. *See also In re Weiss–Wolf, Inc.,* 59 B.R. 653, 655 (Bankr. S.D.N.Y.1986), and *In re Mastercraft Record Plating, Inc.,* 32 B.R. 106 (Bankr.S.D.N.Y. 1983), *rev'd on other grounds,* 39 B.R. 654 (S.D.N.Y.). Midway's separate classification of disputed unsecured claims is an attempt to gerrymander the voting process to facilitate the affirmative vote of an impaired class of claims and thereby satisfy Section 1129(a)(10). This improper classification is further evidence of the non-confirmability of Midway's plan.

Inasmuch as this case satisfies the elements of a bad faith filing set forth in *Phoenix Piccadilly, Albany Partners* and their progeny and the Debtor's proposed Plan is non-confirmable, this case shall be dismissed.

### ORDER

In accordance with the Court's findings of fact and conclusions of law set forth above, it is hereby

**ORDERED AND ADJUDGED** that

1. The Chapter 11 case is dismissed [with prejudice for a period of one year] as a bad faith filing and all pending adversary proceedings also are dismissed.

2. The Debtor and the persons commencing this case are jointly and severally ordered to pay all due and unpaid bankruptcy fees, including all fees due the United States Trustee, through and including the date of entry of this order.

**DONE AND ORDERED.**